UNITED STATES *v.* UNION PAC. RY. Co. *et al.*

*(Circuit Court, S. D. New York.* February 16, 1891.)

TELEGRAPH COMPANIES—GOVERNMENT MESSAGES.

Act Cong. 1862, (12 St. at Large, 489,) granting land and bonds to defendant railway company, provided (section 6) that the company should construct and keep in repair a telegraph line, "and that the government should at all times have the preference in the use of the same, * * * at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service." Rev. St. U. S. § 5266, gave certain rights to defendant telegraph company, and provided that messages sent over its lines by the government should "have priority over all other business, at such rates as the postmaster general shall annually fix." Afterwards defendants entered into an agreement for the joint operation of their telegraph lines. The telegraph operators along the line acted as agents for both the railway and telegraph companies. *Held,* that where a government message, written on blanks of the telegraph company, was delivered to an operator for transmission, it was to be paid for at the rates fixed by the postmaster general for the entire distance, though they might have been transmitted part of the way by the railroad telegraph at commercial rates, if the sender had required it.

At Law.

*Edward Mitchell,* U. S. Dist. Atty.

*Artemus H. Holmes,* for the Union Pacific Railway Company.

*Rush Taggart* and *C. J. M. Gwinn,* for the Western Union Telegraph Company.

LACOMBE, Circuit Judge. The exhaustive arguments of counsel have covered a much broader field of discussion than seems necessary for the

determination of the case. The claim is for $12,495.62, being the aggregate amount of various sums of money paid by different officers of the government to the Western Union Telegraph Company for the transmission of telegraphic messages over the line of the Union Pacific Railroad Company from Council Bluffs to Ogden, and from Kansas City to Boaz. The railway company, or its predecessors in interest, whose obligations and liabilities it has assumed, received from the government large grants of land and bonds, under the acts of 1862 (12 St. U. S. 489) and 1864, (13 St. U. S. 356,) to aid in the construction and maintenance of railway and telegraphic lines west of the Mississippi river. By virtue of section 6 of the act of 1862, above named, it was provided that, in consideration of the grants of lands and bonds to aid in the building of railroad and telegraphic lines, the companies receiving the same should (among other things) "keep the telegraph line in repair and use, and should at all times transmit dispatches over said telegraph line * * * for the government whenever required to do so by any department thereof, and that the government should at all times have the preference in the use of the same, * * * at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service." All compensation for such services rendered for the government were to be applied to the payment of the bonds and interest until the whole amount was fully paid. By section 15 of the act of 1864, above mentioned, the several companies named (including the defendant railway company's predecessors) were required to use their telegraph lines for all purposes of communication, so far as the public and government are concerned, as one continuous line; and the proprietor of any line of telegraph authorized by the act was forbidden to refuse or fail to convey for all persons requiring the transmission of news and messages. Under these acts it was the duty of the defendant railway company to be prepared at all times with the requisite facilities to carry out these obligations, and to transmit dispatches for the government, whenever required to do so by any department thereof, at the rates provided for.

Further provision for securing to the government superior telegraphic facilities was made by congress in the act of July 24, 1866, and subsequent acts, (now found in sections 5263–5268 of the Revised Statutes,) whereby the use of portions of the public domain, and of materials taken from the public lands, was accorded to any and all telegraph companies organized under state laws for the construction, operation, and maintenance of their lines of telegraph. These privileges were conferred only on such companies as should file with the postmaster general their written acceptance of the restrictions and obligations required by the act. Among these obligations was that of transmitting government dispatches over their lines at rates to be fixed by the postmaster general. The section reads as follows:

"Sec. 5266. Telegrams between the several departments of the government, and their officers and agents, in their transmission over the lines of any telegraph company which has been given the right of way, timber, or station lands from the public domain, shall have priority over all other business, at such rates as the postmaster general shall annually fix."

Prior to the sending of the dispatches covered by the complaint, the Western Union Telegraph Company had filed such written acceptance. During all the time covered by the claim of the complaint it maintained and operated (as set forth below) lines of telegraph between Council Bluffs and Ogden, and between Kansas City and Boaz. The postmaster general, from time to time, fixed the rates for transmission of government messages, as provided by section 5266. The amount claimed in the complaint is arrived at by a calculation in which these special rates are employed, and is very much less than it would be if calculated at the ordinary commercial rates prevailing along those lines at that time. At the time, then, that the dispatches which are the subject of the action were sent, the government was entitled, over the lines above referred to, to call upon either of these defendant corporations to take and transmit the same in accordance with the obligations into which such corporations had entered, in return for government aid. It had its choice of agencies. The defendants do not dispute the proposition that, had the government officer who sent the dispatch required the agent who received it to send it by the railway wires, the provisions of the railway acts, above referred to, as to rate and distribution of the proceeds, would apply. Nor, on the other hand, can it be disputed that, if such officer had delivered the dispatch to the agent of the telegraph company for transmission as a government telegram at the rates fixed by the postmaster general, it would have been the duty of the telegraph company to give it priority, and to transmit it at those rates, under the provisions of the telegraph acts. As matter of fact, all of said messages were delivered to the Western Union Telegraph Company by the agent or officer of the government sending the same, written upon the Western Union Telegraph Company's blanks, and each one directed to the receiver of such message at the point of destination, and without any direction to transmit the same over the bonded portion of the line of telegraph of the Union Pacific Railway Company for the whole or any part of the distance. The compensation for each of the messages was computed and paid for, as one entire service, (whether it was wholly, or partly only, over the lines from Council Bluffs to Ogden, and from Kansas City to Boaz,) at the then ruling rate for such entire distance fixed by the postmaster general. The dispatches were paid for either by the sender or the receiver, and have been allowed to him upon the settlement of his account. It is claimed by the government, however, that the circumstances under which the dispatches were delivered for transmission were such as to entitle it to claim that the agency chosen for the service was the railway, and not the telegraph, company, and that the former was thus required to transmit them under the terms of its charters.

Prior to July 1, 1888, the Western Union had constructed and was operating continuous telegraph lines on or near the road-bed of the railway company from Council Bluffs to Ogden, and was also operating continuous lines along or upon the road-bed of the railway company from Kansas City to Boaz. Upon July 1, 1881, the defendants undertook to enter into an agreement for the joint operation of all these lines,

and of the lines constructed by or then operated by the railway company, and during the time covered by the claim of the complaint operated the same in accordance with the terms thereof. Inasmuch as this agreement could in no way alter the obligations which the contracting parties owed to the government under the statutes above referred to, it is not necessary to discuss its validity, nor to refer to its terms, save in the following particulars: The persons who were to receive and transmit such messages as might be delivered at the several stations, whether on commercial or on government business, were the employes of the railway company, who thereafter acted as agents for both the telegraph and the railway company. At each receiving station the same individual received the "telegrams between the several departments of the government and their officers and agents," for the transmission of which only the special rates fixed by the postmaster general, under the telegraph acts, were to be charged; and also "the dispatches for the government, whenever required to do so, by the department thereof," which were to be accounted for in the manner prescribed by the railway acts. Each party reserved the exclusive use of not exceeding three wires between Council Bluffs and Ogden, and not exceeding two wires between Kansas City and Denver, (which is beyond Boaz.) There is nothing to show that under this agreement the railway company disabled itself from fulfilling its obligations under the statutes. It had operators to receive the dispatches it might be required to transmit, and wires by which to transmit them, and could certainly have kept an account of all such. It did not, indeed, keep such account of the dispatches enumerated in the bill of particulars. But if it appears that the government did not, as between the two systems of telegraphic service, in each of which it had reserved special advantages to itself, make choice of the railway; if it never required the transmission of the dispatches in the manner provided in the railway acts,—the railway company was under no obligation to keep such account. The statute contemplates some act of selection,— something which shall require the railway company to fulfill its obligation. No doubt, a formal requisition by a department of the government is not in each case necessary. The officers and employes of such department may fairly be considered its agents for that purpose, but their acts must go to the extent of indicating that on behalf of the department they claim the fulfillment of such obligations.

The first item on the bill of particulars is a dispatch from Jeffersonville to San Francisco. Neither of these places is on the subsidized line. At neither of them was there any agent of the railway company. The delivery on the Western Union blank, to a Western Union agent at the former place, of a dispatch, whose nature indicated that it was entitled to special facilities and rates at the hands of the telegraph company, and with no further request than that it should be forwarded to its destination, was in no sense a requirement that at some remote point it should be transferred, for a portion of the route, to another telegraphic system, from which the government was entitled, if it chose, to require a different service upon different terms. It was the duty of the agent receiving

it to forward it at once, and, if it were possible, without break, to its destination. If, in its transit, it were taken at some intermediate point by an agent of the telegraph company, who was also, at that point, an agent of the railway company, and operating the wires of both, it would, in the absence of any instructions, have been an unwarranted interference on his part with the government's right of choice, to have undertaken to make the change. It was not for him to determine which of its two subsidized systems was to be employed. He was bound to know that the message which had thus come over the wires of his company was being transmitted at special rates, and had no authority, by transferring it to another system, to alter those rates for any portion of the route. Which of the two systems it was, on the whole, for the best interest of the government to employ, was a matter to be determined by its agents, not by those of the defendants. Nor does it seem reasonable to apply any different rule where the dispatch was delivered at a station on the line of the road where the operator was an agent of both companies. The presentation of the dispatch on a Western Union blank, (and also, in the case of prepaid messages, the payment of the special rate,) without any direction to use the railway system, was notice to him, which he could not disregard, to give to the message the advantages which accrued from its transmission by the Western Union lines. Verdict directed for defendants.